**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MURIEL DARLENE BROWN,

                Plaintiff,

                                Case No. 08-11346

v.

                                HON. MARIANNE O. BATTANI

MICHAEL J. ASTRUE,
Commissioner of Social Security

                Defendant.

_____/

**OPINION AND ORDER ADOPTING THE MAGISTRATE JUDGE'S REPORT AND**
**RECOMMENDATION, DENYING PLAINTIFF'S MOTION FOR SUMMARY**
**JUDGMENT, AND GRANTING DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT**

**I.      INTRODUCTION**

      Before the Court are Plaintiff Muriel Brown's Objections to the Magistrate Judge's

Report and Recommendation.  (Doc. 22).  In the Magistrate Judge's Report and

Recommendation ("R&R"), (doc. 21), it was recommended that this Court deny

Plaintiff's Motion for Summary Judgment, (doc. 11), and grant Defendant's Motion for

Summary Judgment, (doc. 19).  For the reasons discussed below, the Court adopts the

R&R.

**II.     STATEMENT OF FACTS**

      As the parties do not object to the R&R's recitation of the procedural history and

background facts of this case, the Court adopts those portions of the R&R.

**III.    STANDARD OF REVIEW**

A district court must conduct a *de novo* review of the parts of a Magistrate

Judge's R&R to which a party objects.  28 U.S.C. § 636(b)(1). The district court "may

accept, reject, or modify, in whole or in part, the findings or recommendations made by

the magistrate." Id.  The requirement of *de novo* review "is a statutory recognition that

Article III of the United States Constitution mandates that the judicial power of the

United States be vested in judges with life tenure." United States v. Shami, 754 F.2d

670, 672 (6th Cir.1985). Accordingly, Congress enacted 28 U.S.C. § 636(b)(1) to

"insure[ ] that the district judge would be the final arbiter" of a matter referred to a

magistrate judge.  Flournoy v. Marshall, 842 F.2d 875, 878 (6th Cir.1987).

The Court must affirm the Commissioner's conclusions so long as the

Commissioner applied the correct legal standards and made findings of fact that are

supported by substantial evidence in the record.  Walters v. Comm'r of Soc. Sec., 127

F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is evidence that a reasonable mind

might accept as adequate evidence in support a conclusion.  Id.  This means that

administrative findings

> are not subject to reversal merely because substantial evidence exists in
> the record to support a different conclusion. The substantial evidence
> standard presupposes that there is a 'zone of choice' within which the
> [Commissioner] may proceed without interference from the courts. If the
> [administrative] decision is supported by substantial evidence, a reviewing
> court must affirm.

Felinsky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted).

2

## IV.    ANALYSIS

Brown essentially has two objections to the R&R.  First, she contends that the Administrative Law Judge's ("ALJ") decision was improper because he did not fully develop the record.  Second, she claims that she is disabled on account of both her arthritis, which meets Listing 1.02, and her mental disorders, which meet Listing 12.04.

### A.    ALJ's Alleged Failure to Develop the Record Adequately

"[A]n administrative law judge's basic obligation to develop a full and fair record rises to a special duty when an unrepresented claimant unfamiliar with hearing procedures appeals before him."  Lashley v. Sec'y of Health and Human Servs., 708 F.2d 1048, 1051 (6th Cir. 1983).  But, the mere fact that a claimant was unrepresented is not grounds for reversal.  Hodlen v. Califano, 641 F.2d 405, 408 (6th Cir. 1981).

Brown alleges that the ALJ failed to adequately develop the record in light of the fact that she was proceeding without counsel at the time.  In particular, Brown's objection centers around the following exchange, which occurred at the beginning of her hearing shortly after the ALJ confirmed that Brown wanted to proceed without representation:

> ALJ:        Who told you to wear the knee brace?
>
> Brown:      My, I have all my information right here.
>
> ALJ:        All right, let me see what you have.
>
> Brown:      All this is basically about everything that is going on now.
>
> ALJ:        No, madam, I cannot look through your whole file, you've got
>              to tell me what you want me to see.

3

| Brown: | Ok. |
|---|---|
| ALJ: | You just can't throw 30 pages at me and ask me to thumb through it.  This is why maybe you should get an attorney. Did a doctor tell you to get this knee brace, madam? |
| Brown: | Yes. |
| ALJ: | What doctor was that? |
| Brown: | Dr. [Paharia]. |

(AR at 229).  Brown contends that this shows "that 30 pages of medical records were not reviewed and could have further corroborated [her] disability assertions."  (Doc. 22 at 5-6).

In light of the record as a whole, the Court finds that ALJ did ensure that a full and fair record was developed.  Brown contends that the ALJ erred at the hearing by not immediately considering the 30 pages of documents that she brought to her hearing; but, it is not apparent from the record what these documents contained or that they were not included in the administrative record that the ALJ later reviewed in making his decision.

Furthermore, the ALJ informed Brown that he was keeping the record open following the hearing and that he would not make a decision for a few weeks so that she could present him with more information.  The ALJ did this because he learned during the hearing that Brown was going to be seeing some doctors over the next few weeks, and he suggested that she get a report from those doctors and send it to him.  (AR at 236).  Then, at the end of the hearing, the ALJ further attempted to ensure that the record was fully developed with the following exchange:

4

ALJ:        All right, thank you very much.  Okay ladies, do you have any questions?  I am not going to make a decision, I'm going to give you a couple of weeks to try to get me these reports, all right?  Do you have any questions, either of you, about what I just said?

Brown:     You need something from my doctor too?

ALJ:        I think yes.

Brown:     Ok.

ALJ:        I think, let me explain something to you, madam, you've chosen to go without an attorney.  I don't know how wise a decision that was, but I can't force you to get one.  But since you're going without an attorney, you should try to get your doctor to give you a report telling me what you're current condition is.  All right?  Because the reports they use to cease you from the disability rules basically say that you have improved and that you're in much better shape.  So if I have to rely upon those rules, you're going to lose.  In those reports you're going to lose, so I'd like to see what you're doctor is saying.  You understand?

Brown:     Yes.

(AR at 237).  The ALJ then informed Brown that she should contact his office if she was having any trouble getting the reports and needed a subpoena.  (Id. at 238).  Based on a review of the record, the Court finds that the ALJ adequately ensured that a full and fair record was developed despite Brown's lack of representation and despite the fact that the ALJ did not immediately look through the documents that Brown presented to him at the hearing.  See Lashley, 708 F.2d at 1051.  Accordingly, this objection fails.

**B.**    **Brown's Arthritis and Mental Disorders**

Brown also objects that, contrary to the R&R's recommendation, her arthritis meets satisfies Listing 1.02 and her mental disorders satisfy Listing 12.04.  If an individual is found to have a medical impairment that meets or exceeds one of the

Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1, the individual will be found to

have an impairment of sufficient severity to render the individual disabled.  20 C.F.R.

§ 416.920(a)(4)(iii).


      *1.     Listing 1.02 – Joint dysfunction*

Listing 1.02 is as follows:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross
> anatomical deformity (e.g., subluxation, contracture, bony or fibrous
> ankylosis, instability) and chronic joint pain and stiffness with signs of
> limitation of motion or other abnormal motion of the affected joint(s), and
> findings on appropriate medically acceptable imaging of joint space
> narrowing, bony destruction, or ankylosis of the affected joint(s). With:

> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee,
> or ankle), resulting in inability to ambulate effectively, as defined in
> 1.00B2b . . . .

20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.02.  The regulations go on to define an

inability to ambulate effectively as follows:

> (1) Definition. Inability to ambulate effectively means an extreme limitation
> of the ability to walk; i.e., an impairment(s) that interferes very seriously
> with the individual's ability to independently initiate, sustain, or complete
> activities. Ineffective ambulation is defined generally as having insufficient
> lower extremity functioning (see 1.00J) to permit independent ambulation
> without the use of a hand-held assistive device(s) that limits the
> functioning of both upper extremities. . . .

> (2) To ambulate effectively, individuals must be capable of sustaining a
> reasonable walking pace over a sufficient distance to be able to carry out
> activities of daily living. They must have the ability to travel without
> companion assistance to and from a place of employment or school.
> Therefore, examples of ineffective ambulation include, but are not limited
> to, the inability to walk without the use of a walker, two crutches or two
> canes, the inability to walk a block at a reasonable pace on rough or
> uneven surfaces, the inability to use standard public transportation, the
> inability to carry out routine ambulatory activities, such as shopping and
> banking, and the inability to climb a few steps at a reasonable pace with

the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00B2b.

The Court finds that substantial evidence indicates that Brown does not satisfy Listing 1.02. Two Residual Functional Capacity ("RFC") Assessments of Brown were performed in October 2003 and May 2004. The October 2003 assessment determined that Brown could stand and/or walk (with normal breaks) for "about 6 hours in an 8-hour workday." The May 2004 assessment found that Brown could stand and/or walk (with normal breaks) for "at least 2 hours in an 8-hour workday." Both RFC assessments also indicated that Brown could occasionally climb a ramp or stairs. Brown submitted no other RFC assessments. This alone provides substantial evidence indicating that Brown can ambulate effective and, therefore, does not satisfy Listing 1.02. See 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00B2b; Walters, 127 F.3d at 528.

Although Brown does point to the October 2003 findings of Dr. Sadiq as supporting her claims of pain, Dr. Sadiq did not indicate that she was unable to ambulate effectively. He merely stated that she walked slowly with impaired weight bearing on her right leg and that she altered her gait in order to avoid pain. He also noted that she did not appear to need to use a cane for walking. Likewise, although the 2006 note from Dr. Paharia indicates that Brown is suffering moderate to severe lower back pain, it fails to show that she is unable to ambulate effectively. As none of this medical evidence undercuts the findings of the RFC assessments, the Court concludes that Brown's argument that she satisfies Listing 1.02 fails because there is substantial

7

evidence indicating that her arthritis is not sufficiently severe to satisfy Listing 1.02 and render her disabled.

    2.    *Listing 12.04 – Affective Disorder*

Listing 12.04 states as follows,

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied . . . .

        A. Medically documented persistence, either continuous or intermittent, of one of the following:

            1. Depressive syndrome characterized by at least four of the following:

                a. Anhedonia or pervasive loss of interest in almost all activities; or
                b. Appetite disturbance with change in weight; or
                c. Sleep disturbance; or
                d. Psychomotor agitation or retardation; or
                e. Decreased energy; or
                f. Feelings of guilt or worthlessness; or
                g. Difficulty concentrating or thinking; or
                h. Thoughts of suicide; or
                i. Hallucinations, delusions or paranoid thinking . . .

        And

        B. Resulting in at least two of the following:

            1. Marked restriction of activities of daily living; or
            2. Marked difficulties in maintaining social functioning; or
            3. Marked difficulties in maintaining concentration, persistence, or pace; or
            4. Repeated episodes of decompensation, each of extended duration . . . .

8

20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04.

After review of the record, the Court finds that there is substantial evidence indicating that Brown's mental deficits are not sufficiently severe to satisfy Listing 12.04. In January 2004, Dr. Tate conducted a psychiatric review and found that Brown had dysthymic affective disorder associated with substance addiction. He concluded, however, that her impairment was not severe and that she suffered only mild functional limitations, which are insufficient to satisfy Listing 12.04.[1] In addition, he explicitly indicated that Brown's dysthymic disorder did not precisely satisfy the criteria for Listing 12.04. Likewise, in May 2004, Dr. Khademian conducted a review of Brown's condition, and he also concluded that Brown's dysthymic disorder did not precisely satisfy the criteria for Listing 12.04. In addition, he found that Brown had no more than moderate functional limitations, which fail to satisfy Listing 12.04. See 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04. Brown has presented evidence of no doctors who, unlike Drs. Tate and Khademian, found that she did satisfy the criteria for Listing 12.04.

In support of her objection, Brown points to the December 2003 findings of Dr. Kumar, a psychiatrist who diagnosed her with dysthymic disorder, a history of alcohol abuse, and borderline personality disorder. He also determined that she had a "GAF" score of 47. Dr. Kumar concluded, "The prognosis is guarded. In my professional opinion, this claimant is not able to manage her benefit funds until she totally sobers up." Dr. Kumar's diagnoses and prognosis do not show that Brown was so limited by

---

[1] The Psychiatric Review form allowed the reviewing doctor to indicate various degrees of functional limitation: none, mild, moderate, marked, and extreme. (See AR at 186). Only marked or extreme limitations satisfy the functional criteria of Listing 12.04. (See id.); 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04.

her mental disorders that she satisfied the criteria for Listing 12.04.  His determination

that she had a GAF score of 47, however, would appear to indicate that Brown was

suffering from significant functional limitations.

As the R&R stated without objection from the parties, a GAF score is a subjective

determination that represents the doctor's judgment of the individual's overall level of

functioning.  (See doc. 21 at 5 n.2).  A GAF score of between 41 and 50 indicates a

finding that Brown has serious symptoms or a serious impairment in social or

occupational functioning.  (See id.).  Accordingly, Dr. Kumar's determination of a GAF

score of 47 does provide some support for Brown's claim that her mental deficits render

her disabled.

It appears, however, that Dr. Kumar's GAF score determination was based on

limitations Brown suffered as a result of her problems with alcohol.  In particular, Dr.

Kumar stated in his prognosis that Brown could not manage her benefit funds "until she

totally sobers up."  Listing 12.04 does not consider limitations that are not the result of

an affective disorder.  See 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04.  Thus,

because Dr. Kumar's GAF score appears not to be the result of an affective disorder, it

does little to support a finding that Brown satisfies Listing 12.04.  Furthermore, even if

Dr. Kumar's GAF score was found to be the result of affective disorders considered by

Listing 12.04, it would be insufficient to demonstrate that substantial evidence does not

support the ALJ's finding in light of the psychiatric reviews performed by Drs. Tate and

Khademian.  As such, Brown's argument that she satisfies Listing 12.04 fails because

substantial evidence indicates that her affective disorders are not sufficiently severe to

satisfy Listing 12.04.

**V.      CONCLUSION**

Accordingly, the Court **ADOPTS** the R&R.  Plaintiff's Motion for Summary

Judgment, (doc. 11), is **DENIED**, and Defendant's Motion for Summary Judgment, (doc.

19), is **GRANTED.**

**IT IS SO ORDERED.**


                                                        s/Marianne O. Battani
                                                        MARIANNE O. BATTANI
                                                        UNITED STATES DISTRICT JUDGE



DATED: September 16, 2009



**CERTIFICATE OF SERVICE**

Copies of this Order were served upon counsel of record on this date by ordinary
mail and/or electronic filing.


                                                        s/Bernadette M. Thebolt
                                                        Case Manager

11